RECEIVED

MAY 2 8 2009

TONY R. MOORE, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE DIVISION

BRAD BOUTIN

VERSUS

NEWFIELD EXPLORATION CO., ET AL.

CIVIL ACTION NO. 07-0567

JUDGE DOHERTY

MAGISTRATE JUDGE HILL

## MEMORANDUM RULING

Pending before the Court are the following: (1) the "Motion for Summary Judgment" [Doc. 156] filed by defendants Roclan Service & Supply Inc., and Roclan Supply, L.L.C. (collectively, "Roclan"), and (2) the Motion for Summary Judgment filed by Roclan's insurer, Lexington Insurance Company ("Lexington") [Doc. 169]. Roclan "moves this Court for judgment as a matter of law pursuant to Federal Rule[] of Civil Procedure 56" on grounds there is no genuine issue of material fact that the plaintiff's damages did not arise from a "reasonably anticipated use" of the allegedly defective product in this case, a safety barricade manufactured by Roclan. Roclan's motion is opposed by plaintiff Brad Boutin [Doc. 166], and Roclan has filed a reply brief [Doc 175]. Lexington moves for summary judgment on grounds that, if Roclan's motion is granted, Lexington has no liability as the insurer of Roclan, as an "insurer's liability is premised upon a finding that the insured is liable." Mr. Boutin opposes Lexington's motion for the same reasons he opposes Roclan's motion [Doc. 173].

For the following reasons, both motions for summary judgment are GRANTED, and plaintiff's claims against both Roclan and Lexington are DENIED AND DISMISSED WITH

PREJUDICE.

## I. Factual and Procedural Background

The following facts are undisputed by the parties:

1.  Mr. Boutin was a nominal employee of Island Operating and was assigned to work as a lead operator aboard a production platform owned by Newfield Exploration Company in the East Cameron 286 Field, which included the platform where the accident occurred, identified as East Cameron 267-A ("EC 267-A"). (See plaintiff's Response to Request for Admissions, attached as Exhibit B to Roclan's Motion for Summary Judgment; Deposition of Brad Boutin, attached as Exhibit C to Roclan's Motion for Summary Judgment, at pp. 29-32, 68-75).

2.  Roclan is in the business of "welding, fabricating, sandblasting, and painting." (See Rule 30(b)(6) Deposition of Roclan, attached as Exhibit B to plaintiff's opposition brief to Roclan's Motion for Summary Judgment, at p. 17).

3.  At some point in 2005, a series of accidents occurred on offshore oil production platforms wherein platform workers fell through open holes on platforms and were injured (See Deposition of Mark Rogers, attached as Exhibit D to plaintiff's opposition brief to Roclan's Motion for Summary Judgment, at pp. 78-79)

4.  In response to these accidents, the Mineral Management Service ("MMS") issued a notice requiring platform operators to have a substantial barricade system in place on these platforms rather than simply taping around an open hole (See Rule 30(b)(6) Deposition of Newfield Exploration Co., attached as Exhibit C to plaintiff's opposition brief to Roclan's Motion for Summary Judgment, at pp. 97-99).

5.  Newfield hired Roclan to manufacture open hole barricades which would be used on Newfield's platforms pursuant to the MMS's directive. (See Rule 30(b)(6) Deposition of Roclan at pp. 29-32; see Deposition of Mark Rogers, at pp. 82-84, 86, 100, 118-119).

6.  An employee of Newfield (Field/Production Foreman Mark Rogers) and an employee Roclan (Tony, or Troy, Breaux) jointly designed the open hole barricades for the platforms under Rogers' supervision, including the barricade for EC 267-A (See Rule 30(b)(6) Deposition of Roclan at pp. 29-32; see Deposition of Mark Rogers at pp. 82-84, 86-87, 100, 118-119. Neither Mr. Rogers nor Mr. Breaux was an engineer. (See Deposition of Mark Rogers at pp. 9, 84).

7.  At the time of the accident, Mr. Boutin and an employee of Environmental and Safety Systems, Brett Ortego, were the only individuals aboard the EC 267-A. (See Rule

30(b)(6) Deposition of Roclan; See Rule 30(b)(6) Deposition of Newfield at pp. 110-114)

8. As the lead operator, Mr. Boutin was in charge and primarily responsible for safety on the EC 267-A. (See Deposition of Brad Boutin at pp. 133, 218, 219, 271, 300). In that capacity, he had stop work authority if he believed any unsafe condition existed. (*Id.* at pp. 154-155, 220).

9. On the date of the accident, Mr. Boutin and Mr. Ortego were jointly engaged in replacing a foghorn on the lower deck of the platform. (*Id.* at pp. 101-103, 110-112). It was decided that a portion of the main deck grating would be removed so the foghorn could be lowered through the opening in the grating on the main (middle) deck. (See Deposition of Brad Boutin at pp. 116-117).

10. Mr. Boutin and Mr. Ortego tried to remove the deck grating by hand rather than use the crane (which was available), and in the course of doing so, the grating on the main deck fell to the deck below creating an open hole in the grating on the main deck of the platform. (*Id.* at pp. 116.117, 121) According to the safety policy of Island, which was known by Mr. Boutin, a safety barricade had to be utilized when working around an open hole. (*Id.* at pp. 94, 133-34, 224, 237, 306-07)

11. Mr. Boutin testified the safety barricade was initially placed around the hole by him but he did not tie it down or otherwise secure it. (See Brad Boutin's responses to Roclain's Requests for Admissions and Deposition of Brad Boutin at pp. 138-40, 162-63).

12. Mr. Boutin further testified he personally moved the barricade off of the hole by himself on multiple occasions because it was in the way for him to reach a parts locker where tools/supplies were kept and/or to work on production equipment. (Deposition of Brad Boutin at pp. 143, 150-51, 163, 194-95, 307). Mr. Boutin did not move the parts locker instead of moving the safety barricade. (*Id.* at p. 247).

13. When Mr. Boutin and Mr. Ortego were preparing to remove the old foghorn through the opening in the grating, Mr. Boutin testified he moved the barricade completely off of the hole in the grating. (*Id.* at pp. 163, 181-82).

14. After rigging up a crane to remove the old foghorn (while the barricade was not over the hole), Mr. Boutin testified he went to retrieve shackles from the parts locker, which was located next to the main deck of the platform, and when he did, he fell through the hole to the deck below resulting in injuries to his spine. (*Id.* at pp. 191-92, 216-17).

Mr. Boutin filed suit against various defendants, including Newfield, Grasso Production

Management, Inc., ESSI Corporation of Louisiana, and several unnamed insurance companies, in the 15th Judicial District Court for the Parish of Vermilion, State of Louisiana, on or around February 26, 2007. The matter was removed to this Court on or around March 26, 2007.[1] Mr. Boutin filed a Second Amended Complaint, in which Roclan was named as a defendant, on September 20, 2009 [Doc. 36]. In the Second Amended Complaint, Mr. Boutin alleges the following claims against Roclan pursuant to the Louisiana Products Liability Act ("LPLA"):

17.

Plaintiffs show that [the] accident and resulting injuries and damages sued upon were the direct and proximate result of the negligence and fault of the defendants herein which negligence and fault is listed more particularly, but not exclusively as follows: [ . . . ]

      C.      Liability for the defective, unreasonably dangerous and negligent design and construction of the barricade placed on the platform and which was in use at the time of the accident sued upon[.][2]

In Roclan's motion for summary judgment, Roclan contends there is no genuine issue of material fact that Mr. Boutin's damages did not arise from a "reasonably anticipated use" of the safety barricade, and that Roclan, therefore, can have no liability under the LPLA.

**II.    Summary Judgment Standard**

"A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. PROC. 56(b). Summary

---

[1] This Court notes the instant lawsuit was originally assigned to Judge Tucker L. Melancon, but was reassigned to this Court on December 7, 2007.

[2] *See* Plaintiff's Second Amended Complaint, Doc. 36, at ¶17(C).

judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).

> When a motion for summary judgment is made and supported as provided in this
> rule, an adverse party may not rest upon the mere allegations or denials of the adverse
> party's pleading, but the adverse party's response by affidavits or as otherwise
> provided in this rule, must set forth specific facts showing that there is a genuine
> issue for trial. If the adverse party does not so respond, summary judgment, if
> appropriate, shall be entered against the adverse party.

FED. R. CIV. PROC. 56(e).

As summarized by the Fifth Circuit in *Lindsey v. Sears Roebuck and Co.*, 16 F.3d 616, 618

(5th Cir. 1994):

> When seeking summary judgment, the movant bears the initial responsibility
> of demonstrating the absence of an issue of material fact with respect to those issues
> on which the movant bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477
> U.S. 317 (1986). However, where the non-movant bears the burden of proof at trial,
> the movant may merely point to an absence of evidence, thus shifting to the
> non-movant the burden of demonstrating by competent summary judgment proof that
> there is an issue of material fact warranting trial. Id. at 322; *see also, Moody v.
> Jefferson Parish School Board*, 2 F.3d 604, 606 (5th Cir.1993); *Duplantis v. Shell
> Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir.1991). Only when "there is sufficient
> evidence favoring the nonmoving party for a jury to return a verdict for that party"
> is a full trial on the merits warranted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,
> 249 (1986).

> The Supreme Court has instructed:

> The plain language of Rule 56(c) mandates the entry of summary judgment, after
> adequate time for discovery and upon motion, against a party who fails to make a
> showing sufficient to establish the existence of an element essential to that party's
> case, and on which that party will bear the burden of proof at trial. Where no such
> showing is made, "[t]he moving party is 'entitled to a judgment as a matter of law'
> because the nonmoving party has failed to make a sufficient showing on an essential
> element of her case with respect to which she has the burden of proof."

> . . . .

. . . In ruling upon a Rule 56 motion, "a District Court must resolve any factual issues of controversy in favor of the non-moving party" only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied. That is a world apart from "assuming" that general averments embrace the "specific facts" needed to sustain the complaint. As set forth above, Rule 56(e) provides that judgment "shall be entered" against the nonmoving party unless affidavits or other evidence "set forth specific facts showing that there is a genuine issue for trial." The object of this provision is not to replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit. Rather, the purpose of Rule 56 is to enable a party who believes there is no genuine dispute as to a specific fact essential to the other side's case to demand at least one sworn averment of that fact before the lengthy process of litigation continues.

*Lujan v. National Wildlife Federation*, 497 U.S. 871, 884, 888-89 (1990)(quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

The Fifth Circuit has further elaborated:

[The parties'] burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence. We resolve factual controversies in favor of the nonmoving party, but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts. We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts. ...[S]ummary judgment is appropriate in *any* case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.

*Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (*en banc*)(citations and internal quotations omitted).

Finally, in evaluating evidence to determine whether a factual dispute exists, "credibility determinations are not part of the summary judgment analysis." <u>Id</u>. To the contrary, "in reviewing all the evidence, the court must disregard all evidence favorable to the moving party that the jury is not required to believe, and should give credence to the evidence favoring the nonmoving party, as well as that evidence supporting the moving party that is uncontradicted and unimpeached." *Roberts*

*v. Cardinal Servs.*, 266 F.3d 368, 373 (5th Cir. 2001).

### III.    Law and Analysis

Federal jurisdiction in this matter is based on the Outer Continental Shelf Lands Act

(OCSLA), 43 U.S.C. § 1331 *et seq.* "OCSLA adopts the law of the adjacent state (Louisiana) as

surrogate federal law, to the extent that it is not inconsistent with other federal laws and regulations.

"Thus the law applicable is 'federal law, supplemented by state law of the adjacent state.'" Fruge

v. Parker Drilling Co., 337 F.3d 558, 560 (5th Cir. 2003)(citations omitted); *see also* 43 U.S.C. §

1333(a)(2)(A).

The Louisiana Products Liability Act ("LPLA") provides the "exclusive theories of liability

for manufacturers for damage caused by their products" under Louisiana law. *Kampen v. American*

*Isuzu Motors, Inc.*, 157 F.3d 306, 309 (5th Cir.1998).  La. Rev. Stat. Ann. §9:2800.52.  Section

2800.54 of the LPLA sets forth the basic parameters for a products liability action under the Act:

> The manufacturer of a product shall be liable to a claimant for damage proximately
> caused by a characteristic of a product that renders the product unreasonably
> dangerous when such damage arose from a reasonably anticipated use of the product
> by the claimant or another person or entity.

La. Rev. Stat. Ann. §9:2800.54(A).[3]  The plain language of the Act shows a plaintiff asserting a

products liability action against a manufacturer faces a two-tiered burden: the plaintiff must show

(1) his damages were proximately caused by a characteristic of the product that renders it

---

[3] A claimant can prove that a product was unreasonably dangerous in four different ways: (1) in
construction or composition; (2) in design; (3) because of an inadequate warning; or, (4) because of nonconformity
to an express warranty. La. Rev. Stat. Ann. §9:2800.54(B).  In the instant case, the plaintiff alleges the first two
theories of the LPLA, that is, that the safety barricade manufactured by Roclan was defective in construction or
composition and in design.  *See* Plaintiff's Second Amended Complaint, Doc. 36, ¶ 17(C).  However, as a threshold
matter, in order to recover under any theory of liability under the LPLA, Mr. Boutin must first prove his damages
arose from a reasonably anticipated use of the product at issue, that is, the safety barricade.  Therefore, this Court
must consider that question first.

unreasonably dangerous, and (2) his damages arose from a reasonably anticipated use of the product. *Kampen*, 157 F.3d at 309; *see also* La. Rev. Stat. Ann. §9:2800.54(D); *Johnson v. Black & Decker U.S., Inc.*, 701 So.2d 1360, 1362 (La. App. 2nd Cir. 1997). If a plaintiff's damages did not arise from a reasonably anticipated use of the product, then the "unreasonably dangerous" question need not be reached. *Kampen*, 157 F.3d at 309, *citing Johnson*, 701 So.2d at 1366; *Delphen v. Department of Transportation and Development*, 657 So.2d 328, 334 (La.App. 4th Cir.1995).

The LPLA defines a reasonably anticipated use as "a use or handling of the product that the product's manufacturer should reasonably expect of an ordinary person in the same or similar circumstances." La. Rev. Stat. Ann. §9:2800.53(7). This objective inquiry requires the court to ascertain what uses of its product the manufacturer should have reasonably expected at the time of manufacture. *See Myers v. American Seating Co.*, 637 So.2d 771, 775 (La.App. 1st Cir.1994); *see also* John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 La.L.Rev. 565, 585-86 (1989)("Kennedy"). However, if the unreasonably dangerous question is reached, the unreasonably dangerous question must be the "most probable cause" of the alleged injury. *Wheat v. Pfizer, Inc.*, 31 F.3d 340, 341 (5th Cir. 1994).

Roclan argues it has presented sufficient evidence for the Court to determine Mr. Boutin *did not use* the safety barricade in question at all, and that, therefore, Mr. Boutin's injury arose from a total non-use of the product. Under this scenario, Roclan argues the "unreasonably dangerous" question need not be reached and it cannot be liable for Mr. Boutin's injuries. However, Roclan argues even if this Court accepts Mr. Boutin's testimony that he did, in fact, use the safety barricade on the day of his accident, the evidence shows no condition of the safety barricade was the "most probable cause" of Mr. Boutin's injury, because the safety barricade was not in use at the time of the

plaintiff's injury.

Accepting Mr. Boutin's testimony as true, the evidence shows that, if indeed Mr. Boutin did use the safety barricade, the safety barricade was not being used *at the time Mr. Boutin fell through the open hole on the platform.* Additionally, Mr. Boutin's testimony shows the reason the barricade was not covering the open hole at the time Mr. Boutin fell through it was because *Mr. Boutin himself moved it prior to the time that he fell.* Mr. Boutin has testified to this unequivocally, and his testimony is uncontradicted. Additionally, and critically, Mr. Boutin testified he moved the safety barricade not because of a defect in the barricade, or because he thought the barricade would not protect him, but for various other reasons *that have nothing to do with the design and/or construction of the barricade.* Rather, Mr. Boutin moved the barricade because it was getting in the way of his access to a tool/parts shed on the main deck, as well as his production work, and, ultimately, because he wanted the hole to be completely uncovered so he could move the foghorn up through the open hole. The relevant portions of Mr. Boutin's testimony on these critical points is set forth below:

Q.  You understood on the day of the accident that Island wanted you, if you had an open hole, to keep a barricade in place whenever you were working near that hole, correct?

A.  Yes.

Q.  Do I understand your testimony today to be that there were occasions that day when you worked around that hole when the barricade was not fully in place?

A.  Yes, that's right.

Q.  And that you made the decision to work with the barricade not fully in place?

A.  Yes.

**Q.  You were the person, in fact, that moved the barricade so that it was not fully in place over the hole, correct?**

**A.** **Yes.**

(Deposition of Brad Boutin, attached as Exhibit "C" to Roclan's Motion for Summary Judgment, at pp. 224-25) (emphasis added).

Q.     You were aware of the hole on the day of your accident, right?

A.     Yes.

**Q.     And you would agree with me that, if the barricade is fully in place, you don't fall through the hole, correct?**

**(deGravelles objects to form)**

**A.     Yes.**

(*Id.* at p 229) (emphasis added).

Q.     The key that we need to know for your unfortunate accident is, that barricade was not in place over the opening of the grating when you fell; is that right?

A.     Yes.

**Q.     You were the person that removed it from that?**

**A.     Yes.**

Q.     From covering that grating?

A.     Yes.

(*Id.* at p. 307) (emphasis added).

Mr. Boutin specifically testified he personally moved the barricade off the open hole on multiple occasions in order to access a tool/parts locker and to work on production equipment, because the barricade was in the way, as follows:

Q.     Did you have to go to the parts locker for any reason –

A.     Yes.

Q.      – to work on this production equipment?

A.      Yes.

Q.      What did you have to get out of the parts locker?

A.      That recorder, the charts are in there, fittings for other pieces of equipment, caps, things that -- tubing fittings, caps and –

**Q.      And you did that with the barricade over the hole, correct?  You went to the parts locker with the barricade over the hole?**

**A.      Not completely over the hole, because at that time, going back and forth, I had to move it, slide it out of the way so I could pass.**

**Q.      Slide what out of the way, the barricade?**

**A.      The barricade.**

**Q.      You needed to move the barricade off of the hole or partially off the hole to do your work on the production equipment?**

**A.      Yeah.**

**Q.      Did you think that was unsafe?**

**A.      Yes.**

Q.      Did you stop and fix it?

(Mr. deGravelles: Object to the form of the question.)

(Examination by Mr. Merchant)

Q.      Did you stop at that point and hook the crane up to the grating and raise the grating back up to the production deck and put the grating back in place?

A.      No.

Q.      Did you ever think of doing that?

A.      Yes.

Q. Why didn't you do it?

A. Because I would have had to open up another hatch cover and we only had one barricade.

Q. So you felt –

A. And I still had this work being done with the new whale coming in. That was priority at that time, receiving the oil and gas from the new well.

(*Id.* at pp. 142-144) (emphasis added)..

Q. But you did take a barricade, slide it partially off the open hole, correct?

A. Yes.

Q. And work on the production equipment?

A. Yes.

Q. And you, also, at some point went into the parts locker – and correct me if I'm wrong – but you had already moved the barricade partially off the open hole?

A. Yes. It's hard to give a direct answer, because, working, doing what I was doing, I can't give you a specific on what I did and when I did it.

Q. Do you recall ever opening the door to the parts locker while the barricade that you had moved over the open hole was fully over the open hole?

A. I don't – I don't know.

Q. Do you ever remember going into the parts locker while the barricade that you had put over the hole was completely over the hole?

A. I'm sure I did go in it, yes.

**Q. Did you have any problems getting into the locker because the barricade was over the hole?**

**A. Yeah.**

**Q. What kind of problem?**

**A.** It was in the way of gaining full access to the locker.

**Q.** What was in the way?

**A.** The barricade.

(*Id.* at pp. 150-151) (emphasis added).

Mr. Boutin testified he ultimately moved the barricade completely off the open hole so he could pull the old foghorn up through the open hole from the cellar deck. Mr. Boutin also confirmed he fell through the open hole not because of a defect in the design or construction of the safety barricade, but because the barricade was not covering the hole at the time he fell through it, to wit:

**Q.** I understand from what you said before that the barricade had been placed over the hole while you were working and moving back and forth. Question 1: Did you move it off of the hole before you fell through it?

**A.** Yes.

**Q.** Question 2: Why did you do that?

**A.** To pull up the old foghorn.

**Q.** Question 3: At any time during that process when you were going to pull up the old foghorn, did you discuss putting the barricade back over the hole for any reason?

**A.** Not that I remember.

**Q.** So, at the time of the operation when you were removing the foghorn and you were down there, you fell through the hole not because of any problem with the barricade, but because it wasn't over the hole, correct...

**(deGravelles objects to form)**

**Q.** Correct?

**A.** Yes.

(*Id.* at pp. 181-82) (emphasis added).

The testimony of Brett Ortego, the only eyewitness to the accident, confirms the testimony of Mr. Boutin, except that Mr. Ortego does not recall seeing the safety barricade being used to secure the open hole on the date of the accident. Mr. Ortego was on the same level of the platform at the time Mr. Boutin fell, just feet away from Mr. Boutin and looking directly at him, when Mr. Boutin fell through the hole. Mr. Ortego testified as follows:

> **Q. As we sit here today, do you have any recollection of Brad Boutin moving a barricade around that opening in the deck on the main deck?**
>
> **A. No.**
>
> **Q. Okay. Do you have any recollection of Brad Boutin ever asking you to move a barricade around that opening?**
>
> **A. No, sir.**
>
> **Q. As far as you know, no barricade was ever put around that opening that entire day; is that correct?**
>
> **A. Correct.**
>
> **Q. Okay. When you left the heliport after y'all made the opening, and you walked down from the heliport to the main deck and Brad came down to the main deck to operate the crane controls, there was no barricade around the hole, correct?**
>
> **A. No, sir. There was none.**
>
> [ . . .]
>
> Q. All right. In any event once you've got the FW/6 [new foghorn] on the bottom deck, tell me what happens next?
>
> A. I start bolting it up and wiring it up and then Brad went to the top. He's still on the same deck. After I done bolted it down and brought the wire in, I still hadn't connected it yet, I went up top because he was looking for a different shackle. He needed some help to go up top to open up the hatch on the

heliport so we could lower the ball through. So, we did that, start lowering it, but we didn't get to change the shackle out and that's what was kept in that tool shed there.

Q. And the tool shed is the yellow tool box that's shown in exhibit number - - exhibit number 4?

A. Correct.

Q. Okay.

A. Then he went to the tool chest, the cabinet, what have you, and opened them up, both doors, and was squatting down looking for it. And I was getting my tools, putting my tools up that I had used. And I noticed - - you know, seen him right there and he asked if I seen the shackles. I kind of got up to look right behind him getting up and he was facing me right here (indicating). And, that's when his foot slipped off and he fell.

[ . . .]

Q. All right. Now, you said - - maybe I misunderstood you. Did you - - did your eyes ever leave him from the time he left the controls [of the crane] until the time that he fell?

A. Whenever he got to the cabinet, he looked on this side (indicating), squatted down. I put my tools in my bag out of - - into my pockets. I looked back up and he was still in the same position. But, about five seconds after that, that's when his foot slipped. When he went to look on this side (indicating), I guess, you know, when you're looking for something, you kind of move that way. That's all it took.

Q. All right. And, just so the record is clear, you kind of made a motion with your head, it was like he was looking to the right?

A. Yes, sir, to the right.

Q. And, moving to the right slightly?

A. Right. By the hole. Towards the hole.

Q. But it would have been to the right in the cabinet that he was moving, correct?

A. Correct.

Q.   And his foot slipped and he fell into the hole?

A.   Right. When you're squatting down, all your pressure is on legs, so one goes out, you're falling. And this leg (indicating) went off and that's when he fell through the hole.

**Q.   And how long before he fell were you looking directly at him ...**

**A.   Like five seconds maybe. It happened really fast.**

**Q.   But, you were looking directly at him at the time that he fell?**

**A.   Correct. I glanced up and maybe five seconds looking at him, shoo (making sound).**

**Q.   And, the shoo (making sound) meaning with a motion - -**

**A.   He fell through.**

[ . . . ]

Q.   When Brad slipped and fell into the hole, did he have his back to the hole?

A.   No. He was right here (indicating). He did have his back to the hole, but his foot was like back to the hole and the side. The hole was like right here (indicating) on the side of him. ... The hole was to the back and to the right of him.

**Q.   And his right foot slipped?**

**A.   Yes sir.**

**Q.   Did you see him lose his balance?**

**A.   Yes.**

**Q.   Why did he lose his balance?**

**(Objection by Mr. deGravelles)**

**A.   His foot slipped off. He was squatting down.**

[ . . . ]

**Q.** Can you think of anybody who had anything to do with causing the accident other than Mr. Boutin?

**(Objection by Mr. DeGravelles.)**

**A.** No, sir.

[. . .]

**Q.** Is there any doubt in your mind that Mr. Boutin knew that opening was there?

**A.** Yeah, he knew it was there.

**Q.** Because he made it?

**A.** Yes.

(Deposition of Brett Ortego, attached as Exhibit "D" to Roclan's Motion for Summary Judgment, at pp. 83-84, 91-92, 105-107, 139-143 155, 162) (emphasis added).

Mr. Boutin has offered no evidence as to the *design* of the safety barricade that contraverts the testimony of Mr. Ortego that Mr. Boutin fell through the open hole because Mr. Boutin did not use the safety barricade to cover the open hole created in the main deck of the platform. Indeed, there is no physical evidence that contradicts the eyewitness testimony of Mr. Ortego – who was feet away from Mr. Boutin at the time of Mr. Boutin's fall – who testified Mr. Boutin did not use the safety barricade to cover the hole.

Although not an eyewitness to the accident, Alton Courville testified he came upon the scene of the accident shortly afterward.[4] Mr. Courville testified as follows:

Q: All right. Tell me what you did. Tell me what happened once you got to 267.

---

[4] It is unclear to this Court exactly what role Mr. Courville played on the date of Mr. Boutin's accident. Roclan's motion describes Mr. Courville as Mr. Boutin's "friend and co-worker," but neither party provides this Court with either the name of Mr. Courville's employer or Mr. Courville' job description.

-17-

A:     Well, one we got there, we was kind of worried about him. We was nervous. So we went downstairs and we went and checked on him, see how he was doing, I mean, and get some rags to put on the back of his head and just trying to keep him calm.

[ . . .]

Q:     And during that time, did you go to the main deck to see where he had fallen through?

A:     Yes, sir. We went upstairs to look around and check out everything, see how everything was. And me and – I'm trying to think of the other guy's name. But we did go upstairs. I went upstairs to check – check on everything, make sure everything was shut in on my panel. Make sure everything was – and make sure nobody else can get – fall in the hole where – when we got there where the hole is – where you come downstairs, you got the – the skimmer's on the left, had the tool shed right there, and the hole was right here. **Well, the barricade was in front of it.** What I –

Q:     When you say the barricade was in front of it, what is "it"

A:     **In front of the hole. The barricade was in front of the hole.**

Q:     All right.

A:     We – I'm positive me and – I'm trying to think of the guy's name. We covered the hole.

Q:     And how did y'all cover it?

A:     We pushed the  – slid the barricade on the hole to where nothing else can –

Q:     All right. And I'm going to ask you to draw a diagram of the main deck. Can you do that for me? I know you're not an artist.

[ . . . ]

A:     That's the hole, and that's the barricade

Q:     All right. Now, at the time that you saw the barricade, you said it was in front of the hole. Was it tied to anything?

A:     No.

(Deposition of Alton Courville, attached as Exhibit "H" to Roclan's Motion for Summary Judgment, at pp. 37-38) (emphasis added).

In response to the motion for summary judgment, plaintiff attempts to create a genuine issue of material fact regarding the construction and/or design of the safety barricade by suggesting his injury could have happened under several different "scenarios," which include the following: (1) Mr. Boutin did not intentionally move the barricade from over the open hole, but rather, when he lost his balance and fell against it, it slid across the grating and did not prevent him from falling through the open hole; (2) Mr. Boutin moved the barricade partly away from its original position of covering the open hole entirely in order to gain easier access to the parts locker as he had done on previous occasions that day, but the barricade remained partly over the open hole, and, as he fell into the hole, the barricade failed to prevent him from falling through the opening and slid across the grating into the position observed by Alton Courville; and (3) Mr. Boutin intentionally moved the barricade from its position over the hatch opening to a position adjacent to the opening as observed by Alton Courville shortly after the accident. Mr. Boutin claims the first scenario is the most consistent with the evidence.

The problem with Mr. Boutin's scenarios is that there is no need to speculate as to *how* the accident occurred, because there is an otherwise credible eyewitness to the accident whose testimony is consistent with that of Mr. Boutin and Mr. Courville, and, therefore, this Court *knows* how the accident, in fact, occurred. Based on the testimony of Mr. Boutin himself, this Court knows Mr. Boutin removed the safety barricade from the open hole prior to the time that he fell:

> **Q.    You were the person, in fact, that moved the barricade so that it was not fully in place over the hole, correct?**

**A      Yes.**

Mr. Boutin testified repeatedly that he himself moved the barricade off the open hole prior to the time that he fell through the hole. Furthermore, this testimony is confirmed by the testimony of Mr. Ortego, the only eyewitness to the accident:

Q.      Is there any doubt in your mind that Mr. Boutin knew that opening was there?

A.      Yeah, he knew it was there.

**Q.      Because he made it?**

**A.      Yes.**

Finally, the foregoing testimony of both Mr. Boutin and Mr. Ortego – far from being contradicted by the testimony of Mr. Courville – is actually *bolstered* by the testimony of Mr. Courville, who confirmed that, if indeed Mr. Boutin used the safety barricade at some point on the day of his accident, he clearly – *at some point prior to his accident* – removed the safety barricade from over the open hole. **Mr. Courville testified the barricade was "in front of" the open hole – *i.e., not covering the hole* – immediately following Mr. Boutin's accident.** Therefore, Mr. Courville's testimony confirms the testimony of both Mr. Boutin and Mr. Ortego *that Mr. Boutin was not using the safety barricade to cover the hole at the time of his accident.*

Based on the foregoing, this Court concludes that, based upon the evidence before it, the safety barricade was not being used to cover the open hole at the time of Mr. Boutin's accident. For this Court to accept any other "scenario," this Court would be relying on speculation, which this Court need not do, as there is reliable, credible testimony establishing how, in fact, the accident in question occurred. The question for this Court is whether Mr. Boutin's failure to use the safety barricade to cover the hole prior to the time that he fell is a "reasonably anticipated use" of the safety

barricade within the meaning of the LPLA.

Mr. Boutin argues if this Court determines Mr. Boutin did not use the barricade, the failure to use the barricade may still be considered a "reasonably anticipated use," because a "defective quality" of the product caused Mr. Boutin to either use it in a manner not intended or to not use it at all. Mr. Boutin cites this Court to several cases that stand for the proposition that if the *defective quality* of a product causes the user to either use it in a manner not intended or to not use it at all, then this constitutes a "reasonably anticipated use" of the product. *See, e.g., Prest v. Olson*, 2000 WL 1154613 (E.D.La. Aug. 14, 2000) (J. Sear); *White v. Black & Decker (U.S.), Inc.*, 2004 WL 1373271 (E.D. La. June 16, 2004) (J. Englehardt); *Harvey v. Toyota Material Handling, U.S.A., Inc.*, 2007 WL 1115235 (W.D. La. Apr. 13, 2007) (J. Hicks); *Boutte v. Kelly*, 863 So. 2d 530 (La. App. 4th Cir. 2003); *Hooker v. Super Products Corp.*, 750 So. 2d 889 (La. App. 5th Cir. 1999). However, Mr. Boutin testified he moved the safety barricade not because of a *defective design, defective construction* or *defective quality* of the barricade, but in order to gain easier access to the parts locker and in order to do his production work, and, ultimately, because he wanted the hole to be completely open so that he could lift the old foghorn up through it. Indeed, Mr. Boutin expressly and specifically testified he fell through the hole not because the safety barricade failed in some way, but because the barricade simply wasn't covering the hole at the time he lost his balance, to wit:

**Q.** **So, at the time of the operation when you were removing the foghorn and you were down there, <u>you fell through the hole not because of any problem with the barricade, but because it wasn't over the hole, correct</u>...**

**(deGravelles objects to form)**

**Q.** **Correct?**

**A.    Yes.**

(Deposition of Brad Boutin, pp. 181-82) (emphasis added).

Considering the foregoing, this Court concludes that, notwithstanding the *argument* of Mr. Boutin in his opposition brief, the uncontroverted *testimony* of Mr. Boutin is that he moved the barricade not because of a defect in the barricade, but because he wanted easier access to the tools/parts locker, and Mr. Boutin fell through the hole not because of a defect in the design and/or construction of the barricade, but because Mr. Boutin moved the barricade away from the open hole such that the hole was not covered at the time Mr. Boutin fell through it. Under this factual scenario, this Court concludes Mr. Boutin's non-use of the safety barricade is not a "reasonably anticipated use" of the barricade. Therefore, this Court need not reach the "unreasonably dangerous" question, and Roclan cannot be liable under the LPLA. *See Kampen,* 157 F.3d at 309, *citing Johnson,* 701 So.2d at 1366; *Delphen v. Department of Transportation and Development,* 657 So.2d 328, 334 (La.App. 4th Cir.1995).

As Lexington's liability is premised upon a finding that Roclan is liable, and as this Court concludes Roclan is not liable, this Court concludes Lexington similarly has no liability in this matter.

**IV.    Conclusion**

Therefore, for the foregoing reasons,

IT IS ORDERED that the "Motion for Summary Judgment" [Doc. 156] filed by defendants Roclan Service & Supply Inc., and Roclan Supply, L.L.C. (collectively, "Roclan") is GRANTED, and plaintiffs' claims against Roclan Service & Supply Inc. and Roclan Supply, L.L.C. are DENIED AND DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Lexington Insurance Company ("Lexington") [Doc. 169] is GRANTED, and plaintiffs' claims against Lexington Insurance Company are DENIED AND DISMISSED WITH PREJUDICE.

THUS DONE AND SIGNED in Lafayette, Louisiana, this ___ day of May, 2009.

REBECCA F. DOHERTY
UNITED STATES DISTRICT JUDGE